J-A19029-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.G., FATHER | : | |
| | : | |
| | : | No. 476 WDA 2025 |

Appeal from the Order Entered March 12, 2025
In the Court of Common Pleas of Allegheny County
Orphans' Court at No: CP-02-AP-0000069-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: I.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.G., FATHER | : | |
| | : | |
| | : | No. 477 WDA 2025 |

Appeal from the Order Entered March 12, 2025
In the Court of Common Pleas of Allegheny County
Orphans' Court at No: CP-02-AP-0000070-2023

BEFORE: BOWES, J., STABILE, J., and BENDER, P.J.E.

MEMORANDUM BY STABILE, J.:           **FILED: NOVEMBER 5, 2025**

J.G. ("Father") appeals from the March 12, 2025 orders that involuntarily terminated his parental rights to his son, J.G., born in February

2014, and his daughter, I.A., born in May 2016 (collectively, "the Children").[1]

After review, we affirm.

We glean the following factual and procedural history from the certified record. Allegheny County Office of Children, Youth, and Families ("CYF" or "the Agency") obtained emergency protective custody of the Children on January 26, 2021, under the following circumstances according to Autumn Smith, CYF clinical manager.[2]

> [T]he family was referred to CYF on January 5, 2021, due to allegations of inadequate supervision, conduct by [a] parent that leaves [a] child at risk, and substance use by a parent. Those allegations were eventually deemed valid.
>
> On January 25, 2021, [Mother] did disclose that she was using cocaine and having unstable mental health. She said she was in need of inpatient treatment.
>
> The family made an arrangement for [Father] and a family friend . . . to care for the Children until [Mother] could get an assessment the next day. And then, if she was sent to inpatient treatment, they would continue caring for the Children. [The family friend] would provide babysitting when [Father] was working.
>
> . . .
>
> [The Children, however,] were left with [Mother]. She then left the Children with her paramour at the time, who allegedly also [had substance abuse issues].

---

[1] The court also involuntarily terminated the parental rights of the Children's mother, T.A. ("Mother"), pursuant to the same orders. Mother filed separate appeals, which we address by separate memorandum at Docket Nos. 474 & 475 WDA 2025.

[2] Father and Mother resided together with the Children until two months prior to their emergency placement with the Agency. *See* N.T., 12/30/24, at 113-14.

- 2 -

[Father] and [the family friend] were informed. They did go pick up the Children, but the Children were removed the next day, being that [they] were left in [Mother's] care, and she left them with an inappropriate adult.

N.T., 11/12/24, at 17-19.

At the time the Agency obtained emergency protective custody, Father was residing in a room in the back of a convenience store and "reported that he did not have adequate space to care for the [C]hildren." *Id.* at 20.

In addition, the Children, who were then ages six and four, were overdue for their age-appropriate medical examinations. J.G. was also found to need eyeglasses. *See id.* at 21, 27. Moreover, there were issues with truancy related to J.G. *See id.* at 21.

We further note that J.G. is diagnosed with attention deficit hyperactivity disorder, for which he takes medication, and he has learning disabilities. J.G. has an individualized education plan and participates in school-based counseling. *See id.* at 21, 25, 54; CYF Exhibit F-2 (Dr. Bernstein report, 11/7/24) at 2. Due to behavioral health concerns, J.G. additionally participates in therapeutic boxing. *See* N.T., 11/12/24, at 25-26. I.A. has no educational or special needs. *See id.* at 27.

Based upon the foregoing, the Agency filed petitions for dependency, and the court adjudicated the Children dependent on April 7, 2021. *See* Joint Stipulation 1 at ¶ 12; N.T., 11/12/24, at 15-16. The court established the Children's respective permanency goals as reunification and, in furtherance

thereof, ordered Father to, *inter alia*, obtain adequate housing.[3] ***See*** N.T., 11/12/24, at 56. Father was additionally afforded supervised in-person and virtual visitation. ***See id.*** at 58. Thereafter, the court further ordered Father to participate in, *inter alia*, parenting skills development. Ms. Smith explained:

> [Father] acknowledged that he was not attending as many visits due to financial concerns. He was not able to kind of give the [C]hildren money, and he always bought food for the kids and he didn't feel he could do that.
>
> So the parenting was to help him understand that his presence was more important than being able to give the kids things.

***Id.*** at 56-57 (cleaned up). In connection with the aforementioned court-ordered directives, the Agency referred Father to the Dad's Program, as well as a father engagement specialist.[4] Further, the Agency instituted in-home services. ***See id.*** at 57, 92.

Father is originally from Jamaica. ***See*** N.T., 12/30/24, at 107; CYF Exhibit F-1 (Dr. Bernstein report, 2/28/24) at 7. While initially a barrier to his receipt of community resources related to housing, he obtained United States citizenship in 2023. ***See*** N.T., 11/12/24, at 57, 92; N.T., 12/30/24, at 106, 109. However, despite engagement with services, at the time of the subject

---

[3] The court additionally established concurrent permanency goals of adoption. ***See*** CYF Exhibit B (dependency orders).

[4] The record does not contain details regarding these services but indicates that they provided Father assistance with housing. ***See*** N.T., 11/12/24, at 57, 92.

- 4 -

hearing, Father failed to obtain adequate housing and remained living in a room in the back of a convenience store. *See* N.T., 11/12/24, at 20-21, 57, 72-73, 91-92; N.T., 12/30/24, at 106-07, 111-13.

The orphans' court found:

From the time of the Children's removal through the TPR proceedings, Father's housing issues remained constant. CYF provided Father housing assistance through the Dad's Program, a father engagement specialist, and then Three Rivers Youth In-Home Services, from 2021 to present. Although Father continues to work with in-home services, Father was unable to achieve adequate independent housing.

Father initially had supervised visitation that transitioned into unsupervised.[5] Father had forty-eight supervised visits in 2021, nine in 2022, two in 2023, and approximately fifteen in 2024. Father's decline in visits were in part due to his emotional state surrounding his [financial in]ability to provide for his Children; therefore, he was provided with in-home services.

. . .

The court held eleven permanency review hearings. Father made minimal to moderate compliance and progress with his court-ordered goals. Further, Father did not engage in [J.G.]'s educational needs. Father likewise did not engage in [the Children]'s medical needs when they went into care.

Orphans' Court Opinion, 4/30/24, at 7-8 (footnotes omitted).

The Agency filed petitions for the involuntary termination of Father's and Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8),

---

[5] Father's visitation transitioned from supervised to unsupervised "at the beginning of the case. . . ." N.T., 11/12/24, at 58-59. As best we can discern, at the time of the subject hearing, he maintained bi-weekly unsupervised visitation. *See* N.T., 11/12/24, at 59; N.T., 12/30/24, at 111.

and (b) on March 30, 2023.[6]  Ultimately, the court held a hearing on the Agency's petitions that commenced on November 12, 2024, and continued on December 17, 2024, December 30, 2024, and March 5, 2025.[7, 8]  At the time the hearing began, the Children were ten years old and eight years old respectively.  The Agency presented the testimony of Ms. Smith; Brandy Morgan, Auberle foster care coordinator; Timothy Jashinski, CYF casework supervisor; and Eric Bernstein, Psy.D., a forensic psychologist, who conducted numerous individual and interactional evaluations of this family.  Father and

---

[6] Pursuant to orders of July 22, 2024, the court appointed Aimee Burton, Esquire, as legal interests counsel for J.G. and Andrea Spurr, Esquire, as legal interests counsel for I.A.  Attorneys Burton and Spurr represented the Children in the subject involuntary termination hearing.  Accordingly, the requirements of 23 Pa.C.S.A. § 2313(a) were met.  *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020) ("[W]e grant *sua sponte* review to evaluate (1) whether the orphans' court appointed counsel to represent the legal interests of the children and (2) if the appointed counsel also serves as GAL, whether the orphans' court determined that the child's best interests and legal interests did not conflict.").

[7] As best we can discern, the hearing was delayed, in part, due to an inquiry resulting from Mother's claim of Indian heritage.  *See* Joint Stipulation 1 at ¶ 5.

[8] We note with displeasure that the exhibits from this proceeding were not originally included with the certified record.  We pointedly remind counsel that appellants bear "the responsibility to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Commonwealth v. Wint*, 730 A.2d 965, 967 (Pa. Super. 1999) (citations and internal quotation marks omitted); *see also* Pa.R.A.P. 1921 Note ("Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.") (citation omitted).

Mother testified on their own behalf. Additionally, Mother presented the testimony of Bryn Albee, CYF casework supervisor; and Allison Nespoli, the legal guardian of one of the Children's siblings.[9]

By orders dated and entered on March 12, 2025, the orphans' court involuntarily terminated Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (8), and (b). On April 1, 2025, Father timely filed separate notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte* on April 29, 2025. The orphans' court issued a Rule 1925(a) opinion dated April 30, 2025.

On appeal, Father raises the following issues for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Father's parental rights pursuant to 23 [Pa.C.S.A. § 2511(a)(1)], and (8)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the [Children] pursuant to 23 Pa.C.S.[A. § 2511(b)]?

Father's Brief at 4.[10]

_____

[9] The Children are the youngest of the five children Father shares with Mother. Mother additionally has three older children. *See* CYF Exhibit F-1 (Dr. Bernstein report, 2/28/24), at 1, 4, 5, 9. None of the Children's siblings are the subject of these appeals.

[10] Attorney Burton and Attorney Spurr filed briefs advocating for this Court to affirm the involuntary termination orders on behalf of J.G. and I.A., respectively.

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

**Interest of M.E.**, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. **Id.** at 830; **see also** 23 Pa.C.S.A. § 2511(a)(1)-(11). If the

orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013); **see also** 23 Pa.C.S.A. § 2511(b). This Court need only agree with the trial court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. **See In re K.R.**, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*) (citing **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Accordingly, we analyze the orders involuntarily terminating Father's parental rights to the Children pursuant to Section 2511(a)(8) and (b),[11] which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the

---

[11] Given our disposition relative to Section 2511(a)(8), we need not review and make no conclusions as to the orphans' court's findings with respect to Section 2511(a)(1). **See K.R.**, 200 A.3d at 979 (Pa. Super. 2018) (*en banc*) (observing this Court may review one subsection of Section 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection).

removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

In order to satisfy Section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). Rather, our inquiry is focused upon whether the "conditions" which led to a child's removal or placement have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). This Court has acknowledged:

[T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

*Id*. at 11-12 (emphasis in original; internal citations omitted).

Finally, this Court has also explained that,

while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*) (cleaned up).

Father assails the orphans' court's involuntary termination of his parental rights pursuant to Section 2511(a)(8), essentially challenging the sufficiency of the evidence. *See* Father's Brief at 18. We are not persuaded by Father's argument.

Initially, it is undisputed that the Children had been removed from Father's care for more than four years. *See* N.T., 11/12/24, at 17-19; N.T., 12/30/24, at 114. The Children were removed from Father due to

inappropriate housing and neglect of the Children's medical, educational, and mental health needs. *See* N.T., 11/12/24, at 20-21, 27. Thus, because the Children were removed from the care of Father far in excess of the statutory 12-month minimum, the first prong of Section 2511(a)(8) is satisfied.

As it relates to second prong of Section 2511(a)(8), *i.e.*, whether the conditions which led to the Children's removal or placement still exist, Father asserts that "[t]he conditions that initially led to the Children's removal were primarily associated with the Mother, which Mother has subsequently resolved. There is no evidence that Father's behaviors or conditions were a factor at the time of removal, and he could eventually be caring for the Children after additional [s]ervices for housing." Father's Brief at 18. We disagree inasmuch as Father conflates the first and second prongs of Section 2511(a)(8). As discussed above, the Children were removed from Father's care. Further, as discussed *infra*, the record evidence demonstrates that the conditions which led to the Children's removal continue to exist.

In concluding that the Agency satisfied its burden pursuant to the second prong of Section 2511(a)(8), the court explained that Father did not dispute that he continued to reside in the same room at the back of the same convenience store, which the Agency deemed inappropriate for the Children at the time of their placement. *See* Orphans' Court Opinion, 4/30/25, at 18-19, 21. Given the passage of time and services provided to Father, the court concluded "that these environmental factors were no longer beyond the

control of Father." ***Id.*** at 20. Additionally, the court credited the testimony of Ms. Smith regarding Father's lack of participation in the Children's medical, educational, and mental health needs. ***See id.*** at 19. Specifically, the court found, "Father had not requested to participate in the Children's medical appointments nor sought any notification of the outcome of said appointments." ***Id.*** This is supported by the record.

Indeed, Father acknowledged that he did not have suitable housing and was, therefore, unable to reunify with the Children:

> Q. Did I understand from your testimony that you said that you want to support the [C]hildren being reunified with mom and you'll support them there?
>
> A. Yes, ma'am.
>
> Q. So you are not asking for the [C]hildren to be returned to your care, you're asking --
>
> A. If I had housing. That's the only reason why, the housing. That's the only reason, housing, since I don't have housing. Mom got housing so I don't see any reason why.
>
> Q. So you're not able to care for the [C]hildren today?
>
> A. No, I don't have no housing. Where am I putting them?
>
> Q. Right, okay. So[,] you're asking that the [C]hildren be returned to [M]other today?
>
> A. I would love them to go to mom today. I don't have housing. If I had housing, they would be with me. Since I don't have housing, she got housing, I am willing to do -- (indiscernible).

N.T., 12/30/24, at 112-13; ***see also*** N.T., 11/12/24, at 20-21, 57, 61, 72-73, 91-92 (testimony of Ms. Smith as to Father's lack of appropriate housing).

Additionally, Ms. Smith testified that Father remained uninvolved with respect to the Children's medical, education, and mental health needs. ***See*** N.T., 11/12/24, at 61, 73, 92-93. She explained, "[H]e has not been able to engage in school and medical services for the [C]hildren. [J.G.] was truant when he went into care. They were both [behind] medically when they went into care. And [Father] has not been able to [] engage in those things. . . ." ***Id.*** at 61.

Based upon the foregoing, it is clear that the conditions that led to the Children's removal as they relate to Father persisted at the time of the termination hearing. Accordingly, the second prong of Section 2511(a)(8) is satisfied.

Finally, with respect to the third prong of Section 2511(a)(8), Father argues that the record supports that termination does not "best serve[] the needs and welfare of the Children." Father's Brief at 18. He asserts the evidence revealed the existence of a "strong and loving bond" that is beneficial to the Children. ***Id.*** For the reasons stated *infra* regarding Section 2511(b), we discern no abuse of discretion by the court in concluding that the termination of Father's parental rights will best serve Child's needs and welfare pursuant to Section 2511(a)(8). ***See In re Adoption of G.W.***, 342 A.3d 68, 89 n.20 (Pa. Super. 2025) (*en banc*) (applying the precedent interpreting Sections 2511(a)(8) and (b) "congruently and using the same legal analysis for both subsections).

Section 2511(b) gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

"The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). However, our Supreme Court has concluded that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1109. A bond is considered to be "necessary and beneficial" if its severance would cause "extreme emotional

consequences" or significant, irreparable harm. *Id.* at 1109-10. This Court has recognized that,

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Furthermore, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *M.E.*, 283 A.3d at 839 (cleaned up).

In his second issue, Father disputes the orphans' court's finding of sufficient evidence pursuant to Section 2511(b). *See* Father's Brief at 19-20. Father baldly asserts that a beneficial bond exists between him and the

Children, and, therefore, the bond should be maintained. ***See id.*** at 20. He further notes that, pursuant to Section 2511(b), "it is well established that environmental factors such as inadequate housing cannot be a sole basis for the termination of parental rights." ***Id.*** at 20 (citing ***In re B.L.L.***, 787 A.2d 1007 (Pa. Super. 2001)). He argues, "Father has been compliant in all areas and only his inadequate housing remains an issue preventing return of his Children . . . ." ***Id.***

In terminating Father's parental rights pursuant to Section 2511(b), the orphans' court found that a bond existed between Father and the Children, but that it was not necessary and beneficial. ***See*** Orphans' Court Opinion, 4/30/25, at 26-27. Rather, the court found that the Children shared a beneficial relationship with their foster parents, who desire to adopt them. ***See id.*** Indeed, the court found that the Children's need for stability and permanence would be met by their foster parents and not by Father. Specifically, the court found, as follows.

> Although evidence of a bond exists, the bond is outweighed by Father's inability to remedy the causes of [the] Children's placement, and by the] Children's need for permanence and stability. . . . "The Children view Father as a supportive figure, but not someone they rely on to meet their needs." The court concluded that trust and emotional support rests with foster parents. Focusing on the perspective of [the Children, they] enjoy a special relationship with the foster parents. They have felt safe and secure for the last four years and have acclimated into the foster family unit. The Children identify foster parents as their psychological parents and want to be adopted.

*Id.* (footnotes omitted). Further, the court found that the "Children will not suffer extreme and emotional consequences by severing the bond" between the Children and Father. *Id.* at 27. Upon review, we find ample support for the orphans' court's findings in the certified record. As such, we discern no abuse of discretion and do not disturb them.

Specifically, Dr. Bernstein described Father "as being invested and a loving father who seeks the best for his children, but he indicated that Father "does not fulfill a day-to-day caretaking role and historically has been limited to play interaction." N.T., 12/17/24, at 121; Agency Exhibit F-2 (Dr. Bernstein report, 11/7/24) at 11; *see also* N.T., 12/17/24, at 65.

Conversely, the Children had been placed together in their current pre-adoptive foster home for over four years by the time the subject hearing concluded. *See* N.T., 11/12/24, at 70-71, 164. Dr. Bernstein observed, "The [C]hildren share and enjoy a special relationship with [their foster parents] and look to them as their psychological parents." Agency Exhibit F-2 (Dr. Bernstein report, 11/7/24) at 12. Indeed, the Children refer to their foster parents as "mom and dad." *See* N.T., 12/17/24, at 43 (internal quotation marks omitted). Dr. Bernstein explained,

> [T]he Children's foster parents] have fulfilled a parental role, . . . that the [C]hildren rely upon them for their everyday needs, and [the Children] have developed a strong bond [with their foster parents], that they look to the foster parents to meet their needs, and the [C]hildren had communicated . . . a strong sense [of] comfort and support by both foster parents.

*Id.* at 40.

Dr. Bernstein testified that the Children "strongly endorsed their placement in foster care in a home in which they felt comfortable. Both [C]hildren matched in their enthusiasm about the foster placement." *Id.* at 74. Although he acknowledged that severing the Children's relationship with their parents would be a loss to the Children, he stated that the Children's foster parents would "compensate for that with continually offered stability and support." *Id.* at 65.

As such, Dr. Bernstein opined:

[W]hen considering what is best for the Children, preserving their sense of stability, appreciating that they have developed the strong bond with the foster parents and the foster parents recognize and support sibling contact, and the Children, despite their young ages, have communicated in their own way a desire to remain in their care indefinitely. All of those factors are hard to overlook. And given the totality of circumstances, I supported the court moving forward with the termination of the parents' rights and with the understanding that that may ultimately mean no further contact with the parents.

N.T., 12/17/24, at 91-92 (cleaned up). Moreover, Dr. Bernstein testified that to remove the Children from their foster parents "could be ultimately detrimental to them." *Id.* at 137.

Similarly, Mr. Jashinski testified, as follows:

Q. Has the Agency been able to take note of any kind of bond that the foster parents and the [C]hildren appear to be bonded to one another?

A. Yes, 100 percent. Like I said, the kids are so comfortable with them. . . . [Y]ou can tell there is a parental role that they are filling for them.

- 19 -

N.T., 11/12/24, at 163-64. He continued, "[The Children] are very comfortable where they are. They . . . want to stay with [their foster parents]. That has been their home for the past four years. They are very comfortable there. They have their own -- They have been integrated into that family." *Id.* at 168-69; *see also id.* at 122, 131, 148, 155-56, 159 (testimony of Ms. Morgan as to the Children's comfort and desire to remain in foster home).

Moreover, Ms. Smith stated that, whereas Father failed to participate with respect to the Children's educational, medical, and mental health needs, the foster parents, meet the Children's needs in this regard. *See id.* at 25-27, 61, 71, 81. Consequently, Ms. Smith testified that the Children "deserve to have permanency" with their foster parents. *Id.* at 74. She further pointed to the fact that "[t]he [C]hildren themselves identify [that] they want to be adopted." *Id.* at 74.

Based upon the foregoing, we discern no abuse of discretion by the orphans' court's conclusion that termination of Father's parental rights will serve the Children's developmental, physical, and emotional needs pursuant to Section 2511(b). The record amply demonstrates that Father and the Children do not share a necessary and beneficial relationship. *See K.T.*, 296 A.3d at 1109-10, 1113. Instead, they share such a relationship with their foster parents. While Father may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination

of parental rights. ***See In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted).

Accordingly, we affirm the orders involuntarily terminating Father's parental rights pursuant to Section 2511(a)(8) and (b).

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/5/2025